July 9, 2026

**Supreme Court**

No. 2023-237-C.A.
(P1/11-2541AG)

(Concurrence begins on Page 23)
(Concurrence begins on Page 39)

State                    :

v.                       :

Leron Porter.            :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

|  |  |
|---|---|
| State | : |
| v. | : |
| Leron Porter. | : |

Present: Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

**O P I N I O N**

**Justice Lynch Prata, for the Court.**   The defendant, Leron Porter (defendant), appeals from a Superior Court judgment of conviction for murder in the second degree and two related firearms offenses.  The defendant contends that the trial justice erred in numerous respects and that, as a result, his convictions should be reversed.  Principally, the defendant contends that the prosecutor's peremptory strike of the sole African-American venireperson during voir dire violated the defendant's equal protection rights as guaranteed by the United States Supreme Court's ruling in *Batson v. Kentucky*, 476 U.S. 79 (1986).[1]  For the reasons set forth

---

[1] In *Batson v. Kentucky*, 476 U.S. 79 (1986), the United States Supreme Court held that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will

- 1 -

herein, we vacate the judgment of conviction and remand to the Superior Court for a new trial.

## Facts and Procedural History

A full recitation of the facts in this case is not necessary in deciding the matter before the Court. However, a full recitation of the travel and procedural history is necessary to understand the current posture of the case. Therefore, we will state only the material facts as needed for our analysis. The defendant's convictions stem from the fatal shooting of seventeen-year-old Tiphany Tallo. On May 9, 2011, the victim's sister, Ashley Tallo, and defendant's sister, Daneesa "Mooky" Porter, were engaged in a street fight in Providence, Rhode Island. Tiphany left her apartment building, located across the street, and advanced toward the fight. As she approached, witnesses saw defendant fire a gun in Tiphany's direction. Immediately after, witnesses saw Tiphany place her hand on her chest and collapse. Tiphany was pronounced dead at a local hospital. Shortly thereafter, defendant was apprehended and charged with second-degree murder, two related firearms offenses, and assault with a dangerous weapon.

---

be unable impartially to consider the [s]tate's case against a black defendant." *Batson*, 476 U.S. at 89.

**The First Trial**

A jury trial on the charges commenced in November 2013. *Porter v. Coyne-Fague*, 35 F.4th 68, 72 (1st Cir. 2022) (*Porter III*). During jury enpanelment, Juror 103, the sole prospective African-American juror in the venire, requested to speak with the trial justice at sidebar. *Id.* At sidebar, Juror 103 expressed concerns about facing potential retaliation at his workplace if he served on the jury panel. *Id.* Specifically, Juror 103 explained that in the course of his employment at a local hospital, he interacted with many patients who "follow these cases." *Id.* Juror 103 expressed that, given the chatter about the case, "chances are, regardless which way the verdict goes, I can find myself subject of either allegations or hostile treatment either from the staff or from patients." *Id.* (brackets omitted). Juror 103 affirmed that he was "'not at all' biased or prejudiced in resolving the matter." *Id.*

Shortly thereafter, the prosecutor exercised a peremptory strike against Juror 103 and, without prompting by the court, volunteered his basis for Juror 103's dismissal. *Porter III*, 35 F.4th at 72-73. The prosecutor explained that, in his view, Juror 103 "ha[d] a feeling and [was] under the belief that as a consequence of his verdict, he may face repercussions * * * [b]low-back and concern, based on his verdict." *Id.* at 72. The prosecutor continued,

> "Essentially, what [Juror 103] is saying is that * * * he's a member of the African-American community, the defendant at bar is a member of the African-American community, [Juror 103]'s the only one on the panel who

> is, and if he were to vote guilty there could be consequences to it. * * * [B]ut if he were to vote not guilty, I don't think he would have any consequence." *Id.* at 72-73.

The trial justice granted the peremptory strike, and excused Juror 103. *Id.* at 73. Consequently, a jury absent African Americans was seated. *Id.*

At the conclusion of trial, the jury found defendant guilty of second-degree murder and the two firearms offenses. *Porter III*, 35 F.4th at 73. He was sentenced to two separate terms of life imprisonment for murder and discharging a firearm while committing a crime of violence. *Id.* He was also sentenced to shorter terms for possession of a firearm and for being a habitual offender. *Id.* The defendant was acquitted of the count for assault with a dangerous weapon. *State v. Porter*, 179 A.3d 1218, 1223 (R.I. 2018) (*Porter I*). The defendant appealed his conviction to this Court. *Id.*

On appeal to this Court in March of 2018, defendant argued that the trial justice erred in allowing the state to strike two minority jurors in violation of *Batson*. *Porter I*, 179 A.3d at 1223. With respect to the striking of Juror 103, this Court held that the prosecutor's rationale for striking Juror 103 was "race-neutral and nonpretextual." *Id.* at 1226. We reasoned that, because the prosecutor challenged Juror 103 based on the concerns Juror 103 raised at the outset—possible workplace retaliation resulting from his jury service—the challenge was based upon grounds other than the juror's race. *Id.* Therefore, we concluded that the trial justice did not

- 4 -

err in his decision to excuse Juror 103 and upheld defendant's conviction. *Id.* at 1226-27, 1231.

## Habeas Petition

In September of 2019, after the United States Supreme Court denied his petition for certiorari, defendant filed a petition for writ of habeas corpus in the United States District Court for the District of Rhode Island. *Porter v. Coyne-Fague*, 528 F. Supp. 3d 2, 4 (D.R.I. 2021) (*Porter II*). In considering defendant's habeas petition, the district court found that "[b]ased on the record before the [Rhode Island] Supreme Court, Mr. Porter's rights under *Batson* appear to have been violated during jury selection." *Id.* at 9. Despite the district court's finding, however, it determined that this Court's decision in *Porter I* "[met] th[e] low threshold for what constitute[d] a reasonable application of *Batson* * * *." *Id.* at 8. The district court reasoned that, under a habeas review standard, "[i]t [wa]s not inconceivable for a court, in light of the total circumstances surrounding Juror 103's empanelment, to believe that the [s]tate was motivated by factors other than race in its decision to strike." *Id.* Accordingly, the court deferred to our ruling in *Porter I* and denied defendant's habeas petition. *Id.* at 9-10.

## First Circuit Court of Appeals

The defendant appealed the district court's decision to the United States Court of Appeals for the First Circuit, which issued its decision in 2022. *Porter III*, 35

F.4th at 71. The First Circuit concluded that this Court's holding in *Porter I*—that the state's rationale for striking the sole African-American juror from the venire was "race-neutral and nonpretextual"—was unreasonable. *Id.* at 77; *Porter I*, 179 A.3d at 1226. The First Circuit quoted the prosecutor's stated reason, that Juror 103 was "a member of the African-American community, the defendant at bar is a member of the African-American community, Juror 103 is the only one on the panel who is, and if he were to vote guilty there could be consequences to it[,]" and explained that a basis which "assumes a prospective juror's bias in favor of a defendant because both are members of the same race is not race-neutral under clearly-established Supreme Court precedent." *Porter III*, 35 F.4th at 77, 78 (brackets omitted). The First Circuit ruled that this Court had either "assembled its own rationale for the strike rather than examining the one put forth by the prosecutor" and therefore "unreasonably applied the *Batson* rule," or had "elided the prosecutor's race-explicit comment because it considered that isolated sentence unimportant or ancillary within the context of the prosecutor's somewhat circuitous speech." *Id.* at 78-79. Because this Court overlooked that "[t]he prosecutor's reason * * * echoe[d] the discredited justification for striking 'jurors of the defendant's race on the assumption—or the intuitive judgment—that [the prospective juror] would be partial to the defendant because of their shared race[,]'" the First Circuit held that this Court had unreasonably construed the prosecutor's stated reason for the strike. *Id.* at 81

(brackets omitted) (quoting *Batson*, 476 U.S. at 97). Consequently, the First Circuit reversed the decision of the district court and remanded the case with instructions to grant defendant's habeas writ. *Id.* at 83. The court further ordered "the state courts to vacate the [defendant's] convictions and, unless he [was] tried anew within ninety days of the district court's order, to release him." *Id.*

### The Second Trial

As a result of *Porter III*, a second trial for defendant commenced in the fall of 2022. During voir dire, Juror 90, again the sole African-American venireperson, requested to address the court. At sidebar, Juror 90 disclosed he had a "pending legal case." With both the prosecutor and defense counsel present, Juror 90 divulged to the trial justice that he had a pending DUI refusal in Coventry, Rhode Island. When asked by the court whether he could be fair and impartial sitting as a juror in the case, Juror 90 averred that he could. Juror 90 also admitted that "[he] was in the wrong for what [he] did. So, [he did not] have any harsh feelings towards the police." In the same discussion at sidebar, the prosecutor asked Juror 90 whether the pending case in Coventry was his only interaction with police and if it was his only criminal case. Juror 90 answered affirmatively both times. After requesting Juror 90's date of birth, the prosecutor asked Juror 90 whether he had two pending

cases, rather than one. Juror 90 confirmed that he did have two pending DUI cases—the second of which was pending in East Providence, Rhode Island.[2]

After some questioning from both the prosecutor and defense counsel, the prosecutor then moved to strike Juror 90 for cause, reasoning that he had not been "forthcoming about [his] second criminal case, [and] that they happened back to back." Defense counsel timely objected. The trial justice denied the state's request, finding that there were no grounds to dismiss the juror for cause. The trial justice then asked the prosecutor if he wished to exercise a peremptory strike, which the prosecutor answered in the affirmative. The trial justice explained that they must abide by particular rules in assessing the strike "relative to *Batson*" and emphasized that this was the reason the court was "retrying this case * * *." Ultimately, after hearing from both sides, the trial justice did not allow the peremptory strike, stating that he did not "buy" the prosecutor's proffered race-neutral explanation.

Later, after a court recess, the trial justice commenced a sidebar and inquired whether defense counsel or the prosecution would like to renew the discussion about Juror 90. In response, the prosecutor renewed his request to strike Juror 90 for cause and reiterated that his reason for striking Juror 90 was his two pending criminal

---

[2] Juror 90 informed the trial justice that he had retained counsel for both cases. Likewise, he stated that he understood that he was potentially facing incarceration for his pending charges, but that it would not affect his ability to be fair and impartial as a juror in the trial.

cases.  The prosecutor then referenced police reports which detailed Juror 90's interactions with police, during which Juror 90 allegedly screamed at police officers, directing several expletives towards them.  Additionally, the prosecutor represented that Juror 90 was taking heroin-dependency medication, which he argued may affect Juror 90's attentiveness during trial.  In response, defense counsel argued that Juror 90 had admitted wrongdoing in his interactions with the police and was presumably undergoing drug monitoring through pretrial services.  Defense counsel underscored the importance of retaining Juror 90 because he was the only African-American venireperson present.

The trial justice stated that dismissing Juror 90 for cause was "a very close call" because it required further inquiry into Juror 90's prior interactions with police.  According to the trial justice, that inquiry was inappropriate because it required an examination of issues relative to Juror 90's pending criminal charges.  Therefore, the trial justice denied the state's challenge for cause.[3]  However, the trial justice granted the prosecutor's peremptory challenge, simply stating that "there [were] absolute strong grounds for a peremptory without any racial undercurrent whatsoever."  At that time, defense counsel renewed his objection.  Over defendant's

---

[3] "[A] *Batson* challenge does not apply to a trial justice's decision to excuse a juror for cause." *State v. Montero*, 339 A.3d 1055, 1083 (R.I. 2025).

objection, Juror 90 was struck and a jury absent African Americans was empaneled. The resulting jury ultimately found defendant guilty.

The defendant filed a motion for new trial, and at a subsequent hearing on that motion, the trial justice returned to the *Batson* issue. The trial justice articulated that he was at first hesitant to allow the dismissal but that, after the court recess, he had changed his mind. The trial justice explained that Juror 90 was not forthright about his second pending case in East Providence until the state confronted him with that information. The trial justice further declared that "there had been no *Batson* interplay anyway, because the defense did not establish a *prima facie* basis to invoke the rule. * * * I saw none of that, but nonetheless I invited the [s]tate to offer its reasons for excusal so that the record was clear and complete." The trial justice found "without reservation, that the prosecutor's explanation was credible, sensible and without a hint of racial bias. * * * [T]here was no *Batson* infringement in this instance." The motion for new trial was denied. The defendant timely appealed.

### Standard of Review

"This Court has held that, 'because of the nature of the inquiry in a *Batson* analysis, a trial justice's decision is accorded great deference.'" *State v. Garcia*, 316 A.3d 1223, 1242 (R.I. 2024) (brackets omitted) (quoting *State v. Gallop*, 89 A.3d 795, 804 (R.I. 2014)). Accordingly, "the ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous." *Garcia*, 316 A.3d at 1242 (quoting

*Gallop*, 89 A.3d at 804); *see Snyder v. Louisiana*, 552 U.S. 472, 477 (2008) ("On appeal, a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous.").

**Discussion**

***Batson* Challenge**

On appeal, defendant argues that the trial justice erred in allowing the state to strike Juror 90, the sole prospective African-American venireperson, in violation of his equal protection rights established in *Batson*. *Batson*, 476 U.S. at 89. The defendant argues that "the trial justice was obligated to look beyond the face of the [state's] race-neutral reason and consider 'all the circumstances' to determine if discrimination was at play." The defendant contends that, in this instance, all circumstances "pointed toward a *Batson* problem, yet the trial justice failed to confront it adequately." Specifically, defendant asserts that the trial justice erred by not engaging in the proper "probing inquiry" required by step three of the *Batson* tripartite framework to determine whether the state's race-neutral explanation for striking Juror 90 was genuine and nonpretextual. In support of his argument, defendant relies on this Court's ruling in *Garcia*, to argue that the trial justice did not adhere to the credibility determination required under *Batson* in determining whether the state's race-neutral explanation should be believed. *See Garcia*, 316 A.3d at 1242-43. The defendant further contends that "a completed *Batson* violation

is a 'structural error' that defies harmless-error analysis[,]" requiring "automatic reversal" and entitling him to a new trial. (Quoting *Porter III*, 35 F.4th at 82.)

In opposition, the state disputes defendant's equal protection argument, and asserts that the trial justice correctly found that the prosecutor's peremptory strike of Juror 90 was constitutional. First, the state argues that the trial justice correctly determined that defendant failed to clear the initial hurdle of *Batson*—to establish a prima facie case of purposeful discrimination by the prosecutor in striking Juror 90. Second, the state argues that, consistent with *Batson*, the trial justice correctly "recognized that the [s]tate genuinely possessed a plausible concern that Juror 90's pending cases and previous attitude toward law enforcement might cause him to be biased against the [s]tate, even subconsciously." The state cites to this Court's ruling in *Gallop* to assert that "[a]n attorney's genuine belief that a juror's experience might cause him or her to favor the opposing party would certainly qualify as race neutral." (Quoting *Gallop*, 89 A.3d at 805.) Accordingly, the state argues that defendant's *Batson* argument is without merit because the state's rationale for excusing Juror 90 was not race-based and thus not pretextual. Third, with respect to step three of *Batson*, the state argues that the trial justice "carefully considered the [s]tate's justifications and correctly determined that the [s]tate provided credible, race-neutral reasons for the peremptory challenge at issue."

- 12 -

## Analysis

"Equal justice under law requires a criminal trial free of racial discrimination in the jury selection process." *Flowers v. Mississippi*, 588 U.S. 284, 301 (2019). "The Constitution forbids striking even a single prospective juror for a discriminatory purpose." *Id.* at 303. Therefore, a prosecutor is prohibited from challenging "potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the [s]tate's case against a black defendant." *Batson*, 476 U.S. at 89; *see Flowers*, 588 U.S. at 299.

"[T]he *Batson* Court delineated a tripartite test for determining whether a criminal defendant has been denied equal protection of the laws by the state's use of a peremptory challenge." *State v. Pona*, 926 A.2d 592, 601 (R.I. 2007) (*Pona I*) (citing *Batson*, 476 U.S. at 96-98). Under *Batson*, the defendant first bears the burden of establishing a prima facie showing of purposeful discrimination. *See Garcia*, 316 A.3d at 1242. If the defendant makes that showing, then the "burden shifts to the prosecution to articulate its race-neutral reason(s) for challenging that particular juror." *Id.* (quoting *State v. Pona*, 66 A.3d 454, 472 (R.I. 2013) (*Pona II*)). "Finally, at the third step, the trial justice is required 'to determine whether the defendant has carried his or her burden of proving purposeful racial discrimination.'" *Id.* (quoting *Pona II*, 66 A.3d at 472).

- 13 -

**Step One**

Under the first step of the *Batson* analysis, the defendant has the burden of "establish[ing] a prima facie case of purposeful discrimination in selection of the petit jury * * *." *Pona I*, 926 A.2d at 601 (quoting *Batson*, 476 U.S. at 96). This Court has noted, however, that "[t]his [first] step of the analysis will become moot if the trial justice moves beyond it to consider the second and third steps." *Gallop*, 89 A.3d at 805; *see Garcia*, 316 A.3d at 1242; *see also Hernandez v. New York*, 500 U.S. 352, 359 (1991) (plurality opinion) ("Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot.").

In this instance we may assume that defendant made such a showing because, although the trial justice did not articulate whether defendant satisfied his burden, the trial justice advanced to step two. *See Pona II*, 66 A.3d at 472-73 ("[W]e will assume that defendant satisfied *Batson*'s first step. Although the trial justice did not state explicitly whether defendant satisfied the first prong, * * * he inquired of the prosecutor whether a race-neutral reason existed for the strike. The trial justice next proceeded to rule on the ultimate question of discrimination."). Specifically, the trial justice stated, "I have not seen * * * a deliberate, purposeful discrimination effort, but I'm going to skip that part and go right to a race-neutral reason that you would

offer, because I'm assuming that [defense counsel] is going to object." Therefore, because the trial justice went straight to step two, precedent dictates that step one became moot. *See id.* at 473; *see also Garcia*, 316 A.3d at 1242. Accordingly, we need not address the state's argument that there was no prima facie showing of discrimination.

**Step Two**

At the second step, the "burden shifts to the prosecution to articulate its race-neutral reason(s) for challenging that particular juror." *Garcia*, 316 A.3d at 1242 (quoting *Pona II*, 66 A.3d at 472). The prosecutor must "give a clear and reasonably specific explanation of his or her legitimate reasons for exercising the challenge." *Id.* (brackets omitted) (quoting *Miller-El v. Dretke*, 545 U.S. 231, 239 (2005) (*Miller-El II*)). At this step, the decisive inquiry is whether the prosecutor's explanation is facially valid. *See Pona I*, 926 A.2d at 602. "[U]nless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Garcia*, 316 A.3d at 1242 (quoting *Pona I*, 926 A.2d at 602). "In order to satisfy the burden, the prosecutor cannot simply deny that he or she had a discriminatory motive or simply assert that he or she acted in good faith in carrying out the peremptory strike." *Id.*

Here, the prosecutor stated his race-neutral reason, that Juror 90 had "two pending criminal cases in which the [s]tate is prosecuting him and he wasn't

forthcoming about the second criminal case." During the initial sidebar, the trial justice denied the state's peremptory strike, stating, "I don't buy the excuse that you offer. There may be other reasons, you didn't articulate them, but I'm not going to let you do it." However, after a court recess, the trial justice reinitiated the conversation about Juror 90, asking the prosecutor if he wanted to "renew [the] conversation about Juror No. 90 * * *." The prosecutor then restated his race-neutral justifications for the peremptory strike, specifying that Juror 90 had upcoming pretrial conference dates for his pending cases. The prosecutor also referenced Juror 90's verbal abuse toward law enforcement officers detailed in the police reports. Moreover, the prosecutor stated that Juror 90 had dependency issues which could affect his focus at trial. The trial justice accepted those race-neutral reasons and allowed the peremptory strike.

Given that the prosecutor's stated reasons for challenging Juror 90 were not on account of his race, we are satisfied that the state met its low burden to provide a clear and reasonably specific explanation of legitimate reasons for the peremptory strike. *See Gallop*, 89 A.3d at 806 ("While the reason offered by the prosecutor for a peremptory strike need not rise to the level of a challenge for cause, the fact that it corresponds to a valid for-cause challenge will demonstrate its race-neutral character.") (deletion omitted) (quoting *Hernandez*, 500 U.S. at 362-63); *see also Porter III*, 35 F.4th at 76 ("[A race-neutral] explanation will satisfy step two even if

- 16 -

it is downright implausible or fantastic.") (quoting *Purkett v. Elem*, 514 U.S. 765, 768 (1995) (per curiam)).

## Step Three

The critical question for the trial justice at this stage is determining "whether counsel's race-neutral explanation for a peremptory challenge should be believed." *Gallop*, 89 A.3d at 805 (quoting *Pona II*, 66 A.3d at 472). Accordingly, "a trial justice must undertake a sensitive inquiry into such circumstantial and direct evidence of [discriminatory] intent as may be available." *Garcia*, 316 A.3d at 1242-43 (quoting *Pona I*, 926 A.2d at 602). A trial justice is required to "conduct a probing inquiry into the proffered race-neutral reason(s) and assess the veracity and credibility of the prosecutor's reasons." *Id.* at 1243. "[T]here will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge." *Id.* (quoting *Pona I*, 926 A.2d at 602).

This Court has directed that a trial justice must clearly and unequivocally place on the record his or her findings of fact, credibility determinations, and reasons for accepting or rejecting a defendant's *Batson* challenge. *See Pona I*, 926 A.2d at 608. This foundation is necessary to ensure a complete record for appellate review. *See id.* ("If this Court is to ensure that a trial justice has properly considered the credibility of each proffered race-neutral reason and has addressed each of a

- 17 -

defendant's arguments that a peremptory strike actually was a pretext for purposeful discrimination, we must be presented with an adequate record to review on appeal."). Accordingly, because a trial justice has the vantage point of gleaning the facts to make credibility determinations for a *Batson* analysis, the trial justice's evaluation of the prosecutor's state of mind is accorded great deference. *See id.* at 602 ("It is because a trial justice's finding of purposeful discrimination at this third step 'largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference.'") (quoting *Batson*, 476 U.S. at 98 n.21); *see Flowers*, 588 U.S. at 303 (noting that determinations of credibility and demeanor of the prosecutor exercising a peremptory strike "lie peculiarly within a trial judge's province") (quoting *Snyder*, 552 U.S. at 477).

Here, however, the trial justice failed to undertake the requisite analysis under *Batson*'s critical third step. *See Garcia*, 316 A.3d at 1242-43.  As the United States Supreme Court stated, "the job of enforcing *Batson* rests first and foremost with trial judges. * * * In criminal trials, trial judges possess the primary responsibility to enforce *Batson* and prevent racial discrimination from seeping into the jury selection process." *Flowers*, 588 U.S. at 302.  Doing so necessitates not just the raising of *Batson*, but meaningful engagement with all three of its well-established requirements. *See Batson*, 476 U.S. at 96-98; *see also Pitchford v. Cain*, 146 S. Ct. 1345, 1351-52 (2026) ("[T]he * * * trial court erroneously omitted *Batson*'s third

step: In particular, the trial court * * * never determined whether the prosecutor's stated reasons were pretextual.").

Seemingly out of an abundance of caution, the trial justice raised *Batson sua sponte* and explicitly acknowledged that defendant's initial conviction had been reversed on *Batson* grounds, indicating the basis for a retrial. Notwithstanding the trial justice's intention to ensure defendant a fair trial, the trial justice failed to adequately consider whether the state's proffered justification for striking Juror 90 was pretextual. While we do not suggest that the prosecutor's stated reason—Juror 90's pending criminal charges—was pretextual, the trial court failed to properly assess whether the prosecutor should be believed. *See Pona I*, 926 A.2d at 602.

The trial justice initially articulated that he did not "buy" the prosecutor's excuse for the strike and suggested that the prosecutor possibly had other reasons but did not articulate them. Yet, later, the trial justice stated that "there [were] absolute strong grounds for a peremptory without any racial undercurrent whatsoever." From the record before us, we are unable to discern the trial justice's reasons for changing his mind about the prosecutor's credibility or why he found that Juror 90 could not be an impartial member of the jury. The trial justice did not articulate his perception of the prosecutor's demeanor in light of the circumstances, nor did he evaluate the circumstantial and direct evidence of purposeful discrimination as was available. *See Garcia*, 316 A.3d at 1245 ("A trial justice

- 19 -

should consider all the evidence presented both in support of and in contravention to a purported race-neutral reason and should search beyond the face of a proffered justification to ensure that * * * a peremptory challenge was not, in fact, racially motivated.") (brackets omitted) (quoting *Pona I*, 926 A.2d at 610). *Batson* and its progeny have cautioned about inherent ways discrimination may invade the jury selection process, thus, amplifying the role of the trial justice in assessing whether a peremptory strike is, indeed, racially motivated. *See Flowers*, 588 U.S. at 310 ("[A] prosecutor's dramatically disparate questioning of black and white prospective jurors * * * can supply a clue that the prosecutor may have been seeking to paper the record and disguise a discriminatory intent.").

In the present case, the record reveals that Juror 90 voluntarily requested to speak with the trial justice and counsel at sidebar, where he provided information about his pending criminal case. However, it is the trial justice's lack of analysis with respect to the prosecutor's disparate investigation and probing that concerns us. During a recess, the prosecutor conducted additional research into Juror 90's background, a fact that the trial justice failed to consider at all. *See Flowers*, 588 U.S. at 310 ("Disparity in questioning and investigation can produce a record that says little about white prospective jurors and is therefore resistant to characteristic-by-characteristic comparisons of struck black prospective jurors and seated white jurors. Prosecutors can decline to seek what they do not want to find

- 20 -

about white prospective jurors."). "[B]y asking a lot of questions of the black prospective jurors or conducting additional inquiry into their backgrounds, a prosecutor can try to find some pretextual reason—any reason—that the prosecutor can later articulate to justify what is in reality a racially motivated strike." *Id.* Thus, underscoring why "[a] court confronting [disparate investigation and questioning] cannot ignore it." *Id.*

While "disparate questioning or investigation alone does not constitute a *Batson* violation[,]" "disparate questioning and investigation of prospective jurors on the basis of race can arm a prosecutor with seemingly race-neutral reasons to strike the prospective jurors of a particular race." *Flowers*, 588 U.S. at 310. Therefore, absent factual findings as to *Batson*'s essential third step, we are unable to properly review the trial justice's analysis, and thus cannot affirm his decision. *See Pitchford*, 146 S. Ct. at 1353 (stating that "whether due to confusion, oversight, an overly hurried jury selection process, or some other cause, things broke down, and the ordinary trial-court procedure for resolving *Batson* claims at step three never occurred[,]" constituting error).

In sum, the trial justice skipped step one, accepted the prosecutor's race-neutral reasons articulated under step two, then skipped step three altogether. In furtherance of our ruling in *Pona I*, we hold that to safeguard a criminal defendant's inalienable right to a fair trial, a trial justice must engage in a meaningful

*Batson* analysis, in which the trial justice must address, delineate, and explain his or her rationale as to all three steps of the tripartite test on the record. We recognize that, in the present case, this is the second jury pool for defendant wherein there was only one African-American venireperson. Both times, the state's use of peremptory strikes resulted in defendant being tried by a jury absent African Americans. That embarrassing reality highlights why the *Batson* analysis was critical. As the Supreme Court has noted,

> "[a] structural defect affect[s] the framework within which the trial proceeds, rather than simply an error in the trial process itself. 'Without these basic protections, a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair.'" *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991) (quoting *Rose v. Clark*, 478 U.S. 570, 577-78 (1986)).

Therefore, we conclude that a *Batson* error is a structural error defying harmless-error analysis. *See id.*; *see also Porter III*, 35 F.4th at 82 ("Reversal of the conviction is automatic because * * * a completed *Batson* violation is a 'structural error' that defies harmless-error analysis.") (quoting *Sanchez v. Roden*, 753 F.3d 279, 307 (1st Cir. 2014)). While we acknowledge that the trial justice attempted to remedy this error during the hearing on a motion for a new trial, at that stage, the error was incurable. Thus, vacation of defendant's conviction and a new trial is the appropriate remedy.

The defendant also raises evidentiary arguments in support of his position that the trial court erred in denying his motion for a new trial. However, given our above ruling on the *Batson* issue, we need not address the defendant's other arguments.

## Conclusion

For the foregoing reasons, we vacate the judgment of the Superior Court and remand the matter for a new trial. The papers may be returned to the Superior Court.

Justice Goldberg participated in the decision and authored a concurring opinion but retired prior to its publication.

**Justice Goldberg, concurring**. I agree with the Court's opinion but write separately to emphasize the importance of adhering to the tripartite test articulated in *Batson v. Kentucky*, 476 U.S. 79 (1986).

Let there be no mistake; this Court is resolute in its opinion that discrimination has no place in any aspect of the judicial system, including jury selection. Our shared values recognize that such intolerance is abhorrent, and the Court is unanimous and unwavering in this conclusion. It is also beyond peradventure that in *Batson* the United States Supreme Court articulated the tripartite test to evaluate whether a prosecutor's invocation of a peremptory challenge was based upon race or other impermissible considerations. *See Pitchford v. Cain*, 146 S. Ct. 1345, 1349 (2026).

Because the tripartite test emanates from the Equal Protection Clause of the Fourteenth Amendment, it is binding upon state and federal courts. Thus, "the job of enforcing *Batson* rests first and foremost with trial judges." *Id.* at 1351 (quoting *Flowers v. Mississippi*, 588 U.S. 284, 302 (2019)).

In many respects, this matter represents a case study in *Batson*. Before trial, prospective jurors were asked to complete a jury questionnaire. When voir dire began, the prosecutor expressed that the parties had the opportunity to review those questionnaires and that he had "some follow-up questions based on different people's answers." Included in the questionnaire was interrogatory number eighteen, which asked whether the prospective juror had a pending criminal case or knew someone that had a pending criminal case. Although the questionnaires do not appear in the record, it is uncontroverted that Juror 90, who was apparently a person of color, answered question eighteen in the affirmative; and, when the prosecutor inquired, Juror 90 requested to approach the bench, which the trial justice permitted.[1]

Initially, Juror 90 was forthcoming; he acknowledged that he had a pending case involving driving under the influence/refusal out of Coventry, Rhode Island. Juror 90 further indicated that the Coventry incident had occurred a couple of months previously and would have no bearing on his deliberations; he added that he had no

---

[1] Because the questionnaires are not included in the record, it is unclear whether any other prospective juror answered question eighteen affirmatively.

negative feelings toward the police. When discussion arose concerning whether defendant's trial dates might interfere with Juror 90's own court dates, the trial justice—in an obvious effort to seat Juror 90—proactively declared that, if any scheduling conflicts arose, he would "take care of that."

The prosecutor continued voir dire and soon asked whether the Coventry case was "your only interaction with the police?" Juror 90 responded, "Yes, sir." Moments later, the prosecutor asked again, "So the only criminal case you have is the Coventry DUI and refusal[?]" Once again, Juror 90 answered affirmatively. Thereafter, the following ensued:

> "[PROSECUTOR]: Is your date of birth * * * [19]85?
>
> "JUROR NO. 90: That's correct.
>
> "THE COURT: Do you have two cases pending?
>
> "JUROR NO. 90: No. I have one. I have the DUI and refusal. No. Yeah, I do have two cases pending, actually. One from --
>
> "[PROSECUTOR]: East Providence?
>
> "JUROR NO. 90: Yes. East Providence and Coventry. Yes, I do.
>
> "[PROSECUTOR]: So you were arrested by two different departments?
>
> "JUROR NO. 90: Yes. That's correct.
>
> "THE COURT: What's the East Providence case?

"JUROR NO. 90:    Same thing as the Coventry case."

While the foregoing *might* have been attributable to forgetfulness or another innocent explanation, defense counsel's ensuing colloquy elicited additional answers suggesting that Juror 90's previous responses were less than truthful:

> "[DEFENSE COUNSEL]:  Yes.   So which is first, Coventry or East Providence?
>
> "JUROR NO. 90:         East Providence was first.
>
> "[DEFENSE COUNSEL]:  And roughly how long ago? Six months, eight months, a year?
>
> "JUROR NO. 90:         A few months ago.  Less than six.
>
> "[DEFENSE COUNSEL]:   Do you know whether or not you're being charged with a second refusal within a five-year period?
>
> "JUROR NO. 90:         I am.
>
> "[DEFENSE COUNSEL]:   And do you know that that could result in incarceration?
>
> "JUROR NO. 90:         I'm aware, yes."

At this juncture, Juror 90 reiterated that he could be fair and bore no "hard feelings" toward the police.  Nonetheless, the prosecutor moved to strike Juror 90 for cause, noting the pending criminal cases as well as the less than forthcoming responses concerning the East Providence case.  After the trial justice denied the for-cause dismissal request, the prosecutor sought to exercise a peremptory

challenge, further indicating that the Coventry and East Providence charges occurred within a span of approximately eight days, "[a]nd he failed to disclose the second one." The trial justice denied the peremptory challenge.

The record evinces that court proceedings paused for a recess, during which the prosecutor availed himself of the opportunity to review the police reports from the Coventry and East Providence incidents. When court resumed, the prosecutor reported his findings to the trial justice and conveyed that those accounts were "different than how [Juror 90] indicated he interacted with police." Specifically, the Coventry police report indicated that Juror 90 was passed out and revived through the administration of Narcan. The prosecutor further detailed Juror 90's hostility toward the police and noted certain exclamations that he directed at the officer: "F*** you b***h a**" and "Suck my d***, you n***er b***h." According to the prosecutor, the East Providence police report indicated similar behavior and further revealed that Juror 90 was a past heroin user who was on medication to suppress his drug dependency cravings. These reasons, the prosecutor argued, represented "very red big red flags" and he further expressed doubt concerning Juror 90's ability to sit through an expected three-week jury trial. The trial justice again rejected the prosecutor's request to dismiss Juror 90 for cause, expressing that it was a "very

close call,"[2] but he permitted the prosecutor to exercise a peremptory challenge, declaring that he had no "problem with it whatsoever."

Despite the clear record demonstrating Juror 90's unsuitability (again, I note that the jury questionnaires are not part of the record), this Court correctly concludes that the trial justice neglected to address *Batson*'s third prong. This error mandates vacating defendant's conviction for a second time.

*Batson*'s third prong requires a trial justice to conduct a probing inquiry into the proffered race-neutral reason(s) and assess the veracity and credibility of the prosecutor's reasons. *See State v. Pona*, 926 A.2d 592, 602 (R.I. 2007) (*Pona I*). "Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003) (*Miller-El I*). "[I]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be

---

[2] In my opinion, this was not a "very close call" and Juror 90 should have been excused for cause because of his manifest unsuitability to serve in this case, *viz.*, his lack of candor to the trial justice, his demonstrated hostility to the police, and his recent dependency on illicit drugs necessitating medication. It is difficult to conceive of a person less suitable to sit on a jury during an expected three-week murder trial whose scheduled court dates would necessitate interaction with the court.

considered at *Batson's* third step." *Pona I*, 926 A.2d at 603 (quoting *Miller-El v. Dretke*, 545 U.S. 231, 241 (2005) (*Miller-El II*)).

Thus, after *Miller-El II*:

> "[T]he question at *Batson's* third step no longer simply is whether a trial justice *believes* a prosecutor's facially race-neutral reason for exercising a peremptory strike. Instead, a trial justice should consider all the evidence presented both in support of and in contravention to a purported race-neutral reason and should search beyond the face of a proffered justification to ensure that, as applied to the facts of the particular case and with due regard to a comparison of stricken minority venire members to those nonminority members allowed to serve, a peremptory challenge was not, in fact, racially motivated." *Pona I*, 926 A.2d at 610.

Regrettably, in the case at bar, "whether due to confusion, oversight, an overly hurried jury selection process, or some other cause, things broke down, and the ordinary trial-court procedure for resolving *Batson* claims at step three never occurred * * *." *Pitchford*, 146 S. Ct. at 1353.

Interspersed with the tripartite inquiry, the United States Supreme Court has also recognized that "*Batson*'s holding raised several important evidentiary and procedural issues * * *." *Flowers*, 588 U.S. at 301. Three evidentiary and procedural issues warranted extended discussion by the United States Supreme Court, and I likewise conclude that these considerations merit discussion while cautioning that some factors, specifically those suggesting historical or statistical comparisons, may have little utility in Rhode Island.

"First, what factors does the trial judge consider in evaluating whether racial discrimination occurred?" *Flowers*, 588 U.S. at 301 (emphasis omitted). For example, a defendant may present:

- "• statistical evidence about the prosecutor's use of peremptory strikes against black prospective jurors as compared to white prospective jurors in the case;

- "• evidence of a prosecutor's disparate questioning and investigation of black and white prospective jurors in the case;

- "• side-by-side comparisons of black prospective jurors who were struck and white prospective jurors who were not struck in the case;

- "• a prosecutor's misrepresentations of the record when defending the strikes during the *Batson* hearing;

- "• relevant history of the State's peremptory strikes in past cases; or

- "• other relevant circumstances that bear upon the issue of racial discrimination." *Id.* at 301-02.[3]

---

[3] Contrast these considerations with cases in which the prospective juror presents questions *ab initio* about his or her suitability or willingness to serve based upon personal circumstances. *See State v. Montero*, 339 A.3d 1055, 1082-83 (R.I. 2025) (affirming dismissal of Hispanic panel member for cause after prospective juror alerted court staff that family members had tested positive for COVID-19 and she was the primary caregiver); *State v. Garcia*, 316 A.3d 1223, 1244-46 (R.I. 2024) (affirming trial justice's denial of challenge to peremptory strike when prospective juror expressed hesitation about sitting in judgment and applying the beyond a reasonable doubt standard).

Another relevant circumstance may be whether an issue of racial discrimination will be raised at trial.

As *Batson* recognized with respect to the disparate questioning consideration, "the prosecutor's questions and statements during *voir dire* examination and in exercising his [or her] challenges may support or refute an inference of discriminatory purpose." *Batson*, 476 U.S. at 97. For example, in this case, the record reveals that Juror 90 was the only prospective juror subjected to voir dire concerning question eighteen, and the prosecutor reviewed police reports concerning only one prospective juror, Juror 90. Whether Juror 90 was subjected to this questioning because he was the only venireperson who affirmatively disclosed he had a pending criminal case or whether Juror 90 was subjected to this questioning despite other venirepersons responding affirmatively to question eighteen is unclear because the questionnaires are not included in the record nor in the trial transcript. For our present circumstances, however, it suffices that such an inquiry would have been required as part of the third prong searching inquiry.

Trial justices must remain vigilant and continue to distinguish disparate questioning that is "motivated in substantial part by discriminatory intent," from disparate questioning "reflect[ing] ordinary race-neutral considerations." *Flowers*, 588 U.S. at 303, 310 (quoting *Foster v. Chatman*, 578 U.S. 488, 513 (2016)). As suggested, *supra*, "disparate questioning or investigation alone does not constitute a

*Batson* violation"; nonetheless, "the disparate questioning or investigation can * * *

*along with other evidence*, inform the trial court's evaluation of whether

discrimination occurred."[4] *Id.* at 310-11 (emphasis added).

"Comparing prosecutive jurors who were struck and not struck can [also] be

an important step in determining whether a *Batson* violation occurred." *Flowers*, 588

U.S. at 311. If "a prosecutor's 'proffered reason for striking a black panelist applies

just as well to an otherwise-similar nonblack panelist who is permitted to serve, that

is evidence tending to prove purposeful discrimination.'" *Id.* (quoting *Foster*, 578

U.S. at 512); *see also Pitchford*, 146 S. Ct. at 1350 (noting the defendant's argument

that the prosecutor "deselected black people from the jury panel who had the same

familial, living, social or marital circumstances as whites who were not deselected").

Moreover, a prosecutor's "failure to engage in any meaningful voir dire examination

on a subject the State alleges it is concerned about is evidence suggesting that the

explanation is a sham and a pretext for discrimination." *Flowers*, 588 U.S. at 312

---

[4] In explaining this consideration, the United States Supreme Court observed that "disparate questioning and investigation of prospective jurors on the basis of race can arm a prosecutor with seemingly race-neutral reasons to strike the prospective jurors of a particular race." *Flowers v. Mississippi*, 588 U.S. 284, 310 (2019). "In other words, by asking a lot of questions of the black prosecutive jurors or conducting additional inquiry into their backgrounds, a prosecutor can try to find some pretextual reason—any reason—that the prosecutor can later articulate to justify what is in reality a racially motivated strike." *Id.* By not subjecting a prospective white juror to the same scrutiny and the same questions, "the prosecutor can try to distort the record so as to thereby avoid being accused of treating black and white jurors differently." *Id.*

(quoting *Miller-El II*, 545 U.S. at 246).  When examining this factor, "a defendant is not required to identify an *identical* white juror for the side-by-side comparison to be suggestive of discriminatory intent." *Id.* at 311-12.

The second evidentiary or procedural issue recognized in *Flowers* is "who enforces *Batson*?" *Flowers*, 588 U.S. at 302.  "In criminal trials, trial judges possess the primary responsibility to enforce *Batson* and prevent racial discrimination from seeping into the jury selection process." *Id.*  As such, when considering a *Batson* challenge, a trial court must consider the parties' arguments and assess "the prosecutor's race-neutral explanations in light of all of the relevant facts and circumstances * * *." *Id.*  The "ultimate inquiry" focuses on whether a prosecutor's preemptory challenge "was 'motivated in substantial part by discriminatory intent.'" *Id.* at 303 (quoting *Foster*, 578 U.S. at 513).   The trial justice's "assessment of the prosecutor's credibility is often important" and "the best evidence of discriminatory intent often will be the demeanor of the attorney who exercises the challenge." *Id.* at 302-03 (quoting *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008)).

"Third, what is the role of appellate review?" *Flowers*, 588 U.S. at 303 (emphasis omitted).  Because this Court must necessarily review the lower court's record, it is imperative that a trial justice make clear and unequivocal findings of fact and set forth his or her reasons for either accepting or rejecting the state's arguments with respect to *each Batson prong* and the applicable evidentiary issues outlined

above. If a trial justice does so, this Court ordinarily will "give those [factual] findings [and credibility determinations] great deference." *Id.* (quoting *Batson*, 476 U.S. at 98 n.21); *see also Snyder*, 552 U.S. at 477 ("[D]eterminations of credibility and demeanor lie 'peculiarly within a trial judge's province' * * *.") (quoting *Hernandez v. New York*, 500 U.S. 352, 365 (1991) (plurality opinion)).

I pause to emphasize, however, that despite adhering to the *Batson* framework and the evidentiary considerations discussed in *Flowers*, some considerations may be an imprecise fit here in Rhode Island. Our prior *Batson* cases have not evidenced the pervasive discrimination found in some other parts of the country where multiple prospective minority jurors (and all or nearly all minority venire members) have faced different questioning, treatment, or exclusion. *See, e.g.*, *Flowers*, 588 U.S. at 308 (noting that the state asked five prospective black jurors (all were eventually struck) a total of 145 questions; by contrast, the state asked the eleven seated white jurors a total of twelve questions); *Snyder*, 552 U.S. at 476 ("[A]ll 5 of the prospective black jurors were eliminated by the prosecution through the use of peremptory strikes."); *Batson*, 476 U.S. at 83 ("The prosecutor used his peremptory challenges to strike all four black persons on the venire, and a jury composed only of white persons was selected.").

By comparing Rhode Island to other jurisdictions, I do not suggest that Rhode Island is immune to the issues raised in *Batson*. Even isolated incidents of

- 34 -

discrimination are intolerable. Rather, I simply recognize the unfortunate circumstance that there is frequently a dearth of potential minority jurors in the venire, which may render certain *Flowers* considerations less useful, such as comparison and statistical evidence. Why are there not more jurors of color? A more fulsome discussion of this failing—while critical in the appropriate forum—is far beyond the scope of this judicial opinion. Rather, we are confronted with a case in which a single minority juror was selected from the venire and dismissed in light of his less than truthful voir dire answers, recent history of hostility to the police, drug dependency issues necessitating medication, and pending criminal charges that could result in incarceration. Based upon this information, it is difficult to imagine a less suitable person sitting in judgment of a defendant charged with murder and facing life imprisonment. The state—which bears the burden of proving defendant's guilt beyond a reasonable doubt—should not be required to ignore such clearly disqualifying conduct.[5] Although the trial justice dropped the ball on *Batson*, he declared that he had no "problem * * * whatsoever" with the preemptory challenge. Neither do I.

While no suggestion has been made that Juror 90's disqualifying conduct should have been overlooked in an effort to ensure that at least one minority member

---

[5] I note that even defense counsel expressed that striking Juror 90 *for cause* was a "close" call.

serve on the jury, eliminating peremptory challenges as a means to ensure a defendant's right to a fair trial is horrifying. When a trial justice declines to dismiss for cause a panel member who has exhibited disqualifying conduct—such as Juror 90—the result is the same, the panel member must be seated in spite of the unsuitability. In other circumstances, a panel member may demonstrate no disqualifying conduct—and thus, not be subject to a dismissal for cause—yet a defendant may not wish this prospective juror seated on his or her jury. Imagine a defendant facing life imprisonment and whose fate will be decided by a jury comprised of law enforcement officers or their family members. In a system without peremptory challenges, would this defendant believe they received a fair trial? All agree that a defendant is constitutionally entitled to a trial free from racial discrimination, but the answer should focus on rigorous enforcement of the tripartite test and, critically, increasing the diversity of the venire; eliminating the use of peremptory challenges where there is but one person of color is not the answer. I emphasize that, when conducting the *Batson* analysis, trial justices must perform the tripartite test with deliberation, not in haste.

To be sure, a trial justice must also consider whether a prospective minority juror was disproportionally subject to race-neutral questioning "to find some pretextual reason—any reason—that the prosecutor can later articulate to justify what is in reality a racially motivated strike." *Flowers*, 588 U.S. at 310. Myriad

other race-neutral circumstances may justify or require disparate questioning in order to assess the suitability of the juror, but a trial justice can and should consider the totality of the circumstances, and at *Batson*'s third prong, distinguish a peremptory strike that is "motivated in substantial part by discriminatory intent" from a peremptory strike motivated by race-neutral reasons. *Id.* at 303 (quoting *Foster*, 578 U.S. at 513). Because race-based peremptory challenges undermine the integrity and confidence in the judicial process, trial justices should consider additional procedures and safeguards.

In the absence of extraordinary circumstances, a trial justice faced with a *Batson* challenge should hear the issue in open court, not at side bar, and without the presence of the venire or the panel. Because a *Batson* objection raises an issue regarding the integrity of the judicial process, such a challenge should not be dispatched with haste or summarily.

This procedure undoubtedly presents challenges to preserve and protect the dignity of the prospective juror, frequently the only person of color in the courtroom. Does the juror remain in the courtroom while the seated prospective jurors and the venire are excused? Or should the challenged juror retire to the jury room only to be singled out and summoned back to the courtroom to be sent away? While time consuming, rather than eliminating peremptory challenges, mandating an individual

voir dire would avoid the Hobson's choice of singling out a minority juror in order to preserve the racial integrity of the jury.

As we have noted, "prosecutors must thoroughly explicate their race-neutral reasons * * *." *Pona I*, 926 A.2d at 610. The trial justice presiding over the *Batson* challenge must clearly and unequivocally set forth his or her findings of fact on the record as to the first two prongs of the *Batson* tripartite test. With respect to the third *Batson* prong—where a trial justice "must 'undertake a sensitive inquiry into such circumstantial and direct evidence of intent as may be available'"—the trial justice must further state on the record, clearly and unequivocally, his or her findings of fact, credibility determinations, and reasons for accepting or rejecting the *Batson* challenge. *See id.* at 602 (quoting *Batson*, 476 U.S. at 93). A trial justice's on-the-record findings and decision should clearly delineate the three *Batson* prongs *separately*.

"In addition, race-neutral reasons for peremptory challenges often invoke a juror's demeanor (*e.g.,* nervousness, inattention), making the trial court's firsthand observations of even greater importance." *Snyder*, 552 U.S. at 477. In these circumstances, "the trial court must evaluate not only whether the prosecutor's demeanor belies a discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor." *Id.* Because a juror's demeanor is typically either not part of the

- 38 -

court record or, if part of the court record, is subject to the interpretation of a non-judicial officer, when assessing a demeanor-related reason for a peremptory strike, a trial justice should make a particular effort to set forth his or her observations regarding the juror's demeanor as part of the trial court's record.

Accordingly, I concur.

**Justice Long, concurring.** Nineteen years ago this Court explained in *State v. Pona*, 926 A.2d 592 (R.I. 2007), that *Batson v. Kentucky*, 476 U.S. 79 (1986), and its progeny should focus "a trial justice's inquiry into the credibility of a prosecutor's race-neutral reasons" when evaluating a prosecutor's attempt to strike a prospective juror by use of a peremptory challenge. *Pona*, 926 A.2d at 610. The Court further clarified that, in light of that line of cases,

> "the question at *Batson's* third step no longer simply is whether a trial justice *believes* a prosecutor's facially race-neutral reason for exercising a peremptory strike. Instead, a trial justice should consider all the evidence presented both in support of and in contravention to a purported race-neutral reason and should search beyond the face of a proffered justification to ensure that, as applied to the facts of the particular case and with due regard to a comparison of stricken minority venire members to those nonminority members allowed to serve, a peremptory challenge was not, in fact, racially motivated. * * * [T]rial justices and this Court must be more vigilant to ensure that racial animus does not infect jury selection by applying the more potent standards set forth in *Miller-El* [*v. Cockrell*], [537 U.S. 322 (2003),]

> *Miller-El* [*v. Dretke*], [545 U.S. 231 (2005),] and *Johnson*
> [*v. California*, 545 U.S. 162 (2005)]." *Id.*

Almost two decades after our decision in *Pona*, the tripartite test required by *Batson* and its progeny continues to confound those tasked with maintaining the vigilance required to ensure that prosecutors are not using peremptory challenges on racial grounds.[1]

The tripartite test is flawed. In *Flowers v. Mississippi*, 588 U.S. 284 (2019), the United States Supreme Court explained that the trial justice's "ultimate inquiry

---

[1] That trial justices repeatedly struggle so mightily with *Batson*'s tripartite test is troubling, particularly in light of the remarkably flimsy yet constitutionally permissible justifications that this Court has said that prosecutors may offer when seeking to strike a minority from the venire. *See State v. Pona*, 926 A.2d 592, 606 (R.I. 2007) (outlining "numerous race-neutral reasons" including a perceived "lack of intelligence necessary to comprehend complex trial concepts as indicated by [a venire member's] questionnaire answers," "mere acquaintance with defense counsel," "advanced age," and perceived "demeanor"). A prosecutor does not face a high bar at step two of the *Batson* test, but they certainly cannot state a race-explicit reason. *See Porter v. Coyne-Fague*, 35 F.4th 68, 78 (1st Cir. 2022). And if they do, a court cannot substitute a more palatable reason in its stead when conducting the appropriate review. *Id.*

Furthermore, it is imperative that at step three trial justices "undertake a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Pona*, 926 A.2d at 602 (quoting *Batson*, 476 U.S. at 93). The intent at issue in step three is the prosecutor's intent, and thus the sensitive inquiry at that stage includes an evaluation of the *prosecutor's* demeanor. *See Snyder v. Louisiana*, 552 U.S. 472, 477 (2008). Of course, it may be that trial justices believe that *Batson* objections are insulting to prosecutors; but defendants have a constitutionally protected right to a criminal trial that is free from racial discrimination during the jury selection process. When they seek to effectuate that right by raising a challenge under *Batson*, trial justices must evaluate all three steps according to long-standing precedent. *See Pitchford v. Cain*, 146 S. Ct. 1345, 1353 (2026).

is whether the State was 'motivated in substantial part by discriminatory intent.'" *Flowers*, 588 U.S. at 303 (quoting *Foster v. Chatman*, 578 U.S. 488, 513 (2016)). Not only does the test leave room for unconscious bias, *see Rice v. Collins*, 546 U.S. 333, 343 (2006) (Breyer, J., concurring) ("How can trial judges second-guess an instinctive judgment the underlying basis for which may be a form of stereotyping invisible even to the prosecutor?"), but it also begs the question: what if discriminatory intent motivates the prosecutor in some less-than-substantial part? It is my firm conviction that discriminatory intent—conscious or not; in substantial part, or to a minor degree—should play *no* role in the jury selection process. Neither the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, nor the Equal Protection Clause of article 1, section 2 of the Rhode Island Constitution allows such discriminatory intent. And in fact, article 1, section 10 of the Rhode Island Constitution affirmatively guarantees that defendants have the right to an impartial jury.

I concur in the decision vacating the judgment of conviction and remanding the papers to the Superior Court for a third trial. Although the tripartite test is flawed, it nevertheless governs this Court's review into whether the prosecutor's use of a peremptory challenge to strike Juror 90 violated Mr. Porter's rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution;

it is clear that the trial justice erred in applying step three during the second trial of Mr. Porter.

Notwithstanding my agreement with the disposition of the appeal, I write separately to renew my call for the Court to "exercise its general supervisory authority to correct errors and abuses in the jury-selection process by promulgating a rule that eliminates the use of peremptory strikes in jury trials * * * ." *State v. Garcia*, 316 A.3d 1223, 1261 (R.I. 2024) (Long, J., concurring). After all, the United States Constitution does not require that any party be granted the privilege of using peremptory strikes in criminal jury trials. *See Ross v. Oklahoma*, 487 U.S. 81, 89 (1988) ("[P]eremptory challenges are a creature of statute and are not required by the Constitution, * * * it is for the State to determine the number of peremptory challenges allowed and to define their purpose and the manner of their exercise."); Seth Coven, *Striking the Peremptory Strike: Why There is No Freestanding Constitutional Entitlement to Peremptory Challenges*, 111 Va. L. Rev. 1771, 1777 (2025). When the privilege of arbitrarily removing venire members who are otherwise qualified to sit as jurors undermines a defendant's right to have a criminal trial that is free from racial discrimination during the jury selection process, I believe we must rethink the wisdom of granting that privilege.

In fact, Rhode Island at one time disallowed peremptory challenges in criminal trials for defendants accused of treason, murder, robbery, rape, arson, or

burglary; and the state was an outlier for not granting such a privilege. *See* G.L. 1938 ch. 625 §§ 17, 67; Comments, *The Right of Peremptory Challenge*, 24 U. Chi. L. Rev. 751, 751 n.1 (1957) ("Rhode Island is exceptional in not allowing peremptory challenges in criminal proceedings in which the defendant is charged with treason, murder, robbery, rape, arson, or burglary."). It is within the Court's authority to convene stakeholders to consider a return to this forward-thinking position and thereby truly work toward ensuring that "racial animus does not infect jury selection * * *."[2] *Pona*, 926 A.2d at 610.

I also renew my admonition to scrutinize critically the justifications offered for for-cause strikes. *See Garcia*, 316 A.3d at 1261 (Long, J., concurring). Rule 24(a) of the Superior Court Rules of Criminal Procedure states that "examination of prospective jurors shall be for the purpose of determining whether a prospective juror is related to a party, or has any interest in a case, or has expressed or formed an opinion or is sensible of any bias or prejudice therein." It is imperative that courts

---

[2] The Arizona Supreme Court eliminated peremptory challenges by court rule in 2021, and the rule became effective in 2022. *See* Paul J. McMurdie et al., *Arizona's Elimination of Peremptory Challenges: A First Look*, 56 Ariz. St. L.J. 1793, 1812 (2024). Initial studies reveal that the change has led to a noticeable increase in jury diversity in Maricopa County without an incurable negative impact on defendants' right to a fair trial. *Id.* at 1814-22; *see also* Hailey Badger Gordon*, Evaluating the Elimination of Peremptory Challenges in Arizona*, 58 Univ. Mich. J.L. Reform 229, 247-56 (2024) (describing Arizona's trial court rule changes following elimination of preemptory strikes that safeguarded trial fairness by ensuring that the challenge-for-cause system functioned effectively).

remain vigilant and always guard against discrimination in whatever way it tries to

find its way into our courtrooms.

# STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE
Licht Judicial Complex
250 Benefit Street
Providence, RI  02903



## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Leron Porter. |
| **Case Number** | No. 2023-237-C.A.<br>(P1/11-2541AG) |
| **Date Opinion Filed** | July 9, 2026 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Associate Justice Erin Lynch Prata |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Robert D. Krause |
| **Attorney(s) on Appeal** | For State:<br><br>Sean P. Malloy<br>Department of Attorney General |
| | For Defendant:<br><br>George J. West, Esq. |